**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY MAE HOLLINGSHEAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0599-WS-C** |
| | ) | |
| **JOHN WINDLEY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 43). The Motion has been fully briefed, including a nearly 200-page multifaceted response/ motion (doc. 48) filed by plaintiff, who is proceeding *pro se*.[1] The Court has reviewed and carefully considered all of the parties' respective filings on the summary judgment issues, and is prepared to rule on same at this time.

**I.    Nature of the Case.**

On August 27, 2007, plaintiff, Dorothy Mae Hollingshead, initiated this action by filing the Complaint (doc. 1) in this District Court against a singular named defendant, John Windley. An Amended Complaint (doc. 10) filed in January 2008 enumerated three defendants, to-wit: (1) John Windley, the Superintendent of the City of Mobile Public Works Department; (2) John Bell, the "Director of City of Mobile Public Works"; and (3) Samuel Jones, the Mayor of the City of Mobile. Neither the City of Mobile nor any department thereof is expressly named as a

---

[1]    Plaintiff has also filed two other filings in opposition to defendants' request for summary judgment (docs. 49, 51). Plaintiff's submissions are often redundant, overlapping and organized in a confusing manner. Also, they exceed the 30-page limit imposed on briefs filed in this District Court. *See* Local Rule 7.1(b). Nonetheless, given plaintiff's obvious attempt to be thorough, orderly and responsive to the summary judgment briefing order, and in deference to her *pro se* status, the Court will not penalize her by obliging her to re-brief the Rule 56 Motion within the 30-page threshold, particularly in the absence of any objection by defendants. Rather, in its discretion, the Court accepts plaintiff's submissions as filed.

defendant.  The Amended Complaint hinges on the contention of Hollingshead, a 55-year old African-American female, that Windley has denied her employment with the City of Mobile Public Works Department for the positions of Equipment Operator II and Equipment Operator III because of her age, gender and race.  Hollingshead accuses Windley of abusing his authority and violating Title VII of the Civil Rights Act of 1964, as well as the Age Discrimination in Employment Act, by failing and refusing to hire her for positions for which she was qualified.  As for defendants Bell and Jones, the Amended Complaint alleges that she notified both of them in writing of Windley's purported abuse of his authority, yet "they did not try to do anything about it" even though "at that time a phone call could have stopped his abuse."  (Doc. 10, at 3.)

II.     **Relevant Facts.**[2]

        *A.*     ***Plaintiff's Employment History.***

        Taken in the light most favorable to Hollingshead, the summary judgment record reflects that she was hired as an Equipment Operator II in the City of Mobile's Public Works Department on April 7, 2001.  (Westerberg Aff., ¶ 2 & Exh. A; Hollingshead Dep., at 20-21.)  In that capacity, Hollingshead worked as a camera technician, operating the City's first camera truck and performing storm-drain inspections.  (Hollingshead Dep., at 19.)  In addition to these responsibilities, Hollingshead operated a dump truck and drove crew trucks from time to time to transport crew members if, for example, the regular driver was not present.  (*Id.* at 20.)  Hollingshead apparently performed well in the Equipment Operator II position.  Indeed, her Annual Service Rating Report dated April 7, 2005 reflects an overall rating of "High Quality Job Performance," meaning that she "meets all job standards and exceeds some job expectations." (Doc. 48, at 8-9.)

        Plaintiff voluntarily resigned her position with the City of Mobile in good standing in October 2005 to accept a supervisory job with the City of Prichard Water Works and Sewer

---

[2]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

Board.  (Westerberg Aff., ¶ 2 & Exh. A; Hollingshead Dep., at 19, 21.)[3]  Hollingshead's position

with the Prichard Water Works and Sewer Board involved supervision of repairs of sewer and

water lines.  (Hollingshead Dep., at 21.)  According to Hollingshead, her job in Prichard was

similar to the position she had held with the City of Mobile, with the critical difference being

that in Prichard she had greater supervisory responsibility.  (*Id.* at 22.)  In or around September

2006, Hollingshead resigned from her position in Prichard.  (*Id.* at 22-23.)[4]

   On September 25, 2006, Hollingshead wrote a letter to the Mobile County Personnel

Board requesting reinstatement to her former Equipment Operator II position in the City of

Mobile Public Works Department.  (Defendants' Exh. 9.)  Plaintiff further requested "to be

placed on the re-employment list" on the ground that she had left her Public Works Department

job less than one year earlier and had resigned in good standing.  (*Id.*)[5]  On September 27, 2006,

the Personnel Board approved the placement of Hollingshead's name on the re-employment list,

giving her priority over ordinary "employment register" candidates for rehire purposes.  She was

not formally rehired at that time, however.

---

[3] Plaintiff's resignation letter dated October 13, 2005 thanks her supervisors "for their kind treatment" of her and includes the following parting sentiment: "I wish the City of Mobile every good fortune and I would like to thank you for having me as part of your team." (Defendants' Exh. 4.)  Because Hollingshead provided timely written notice of her resignation, the Personnel Board for Mobile County, Alabama designated her resignation as having been made "in good standing" effective October 29, 2005.  (Defendants' Exh. 5.)

[4] The reasons for plaintiff's departure from the Prichard job are beyond the scope of, and not directly relevant to, defendants' summary judgment motion.  That said, the Court notes that Hollingshead sent a letter to Prichard officials dated September 22, 2006 wherein she complained that her supervisor had told her that she "did not fit in" and that she would be fired unless she resigned.  (Defendants' Exh. 7.)  On that basis, Hollingshead maintained that her resignation from the Prichard position was effected "under duress."  (*Id.*)  There is no indication that defendants were aware of these acrimonious circumstances surrounding Hollingshead's separation from the Prichard job at the time she sought re-employment in Mobile.

[5] On that same date, Hollingshead asked the Mobile County Personnel Board to place her on the register for promotion to the position of Public Services Supervisor I with the City of Mobile Public Works Department.  (Defendants' Exh. 10.)  The Personnel Board apparently deemed her ineligible for promotion because she was not currently employed in that Department.  That determination has not been challenged by plaintiff in these proceedings, and will not be examined by this Court.

In the wake of her resignation from the Prichard position, Hollingshead re-applied for work in the City of Mobile Public Works Department as an Equipment Operator II or an Equipment Operator III.  (Hollingshead Dep., at 24-25, 30.)  In that regard, she submitted a written application for the Equipment Operator III job (including, without limitation, operation of an automated solid waste truck) in late August 2006.  (Defendants' Exh. 11.)[6]  Several weeks later, in late September 2006, Hollingshead submitted a written application for the position of Equipment Operator II (including, without limitation, operation of a trash truck and trailer).  (Defendants' Exh. 12.)

The application form for the Equipment Operator III job specified that a minimum qualification for the position was that the applicant "must have one year's direct experience operating an Automated Solid Waste Truck or similar equipment."  (Defendants' Exh. 11.)[7]  On that basis, the application form required applicants to delineate their experience that enabled them to fulfill this qualification.  In her application, Hollingshead represented that she in fact did have one year of experience operating an automated solid waste truck and stated as follows: "I trained with City of Mobile in 2005 when I worked for the Public Works Dept. ... Mobile Public Works gave me training."  (*Id.*)  Thus, Hollingshead conceded that she did not have one year of experience in operating an automated solid waste truck on a daily basis, but explained that she had trained on that equipment on an ongoing basis every time training sessions were offered by, for example, coming down to the yard on Saturdays during the 2004-2005 period.  (Hollingshead Dep., at 33.)  As Hollingshead explained in her testimony, "I didn't work day to day on it, but I

---

[6]     The application is dated August 29, 2005; however, Hollingshead conceded in her deposition that the listed date was erroneous by exactly one year and that she sought the position in 2006, not 2005.  (Hollingshead Dep., at 30-32.)  There is no dispute on this point.

[7]     This requirement was softened somewhat in an official job description for the Equipment Operator III classification, which listed as Minimum Qualification Requirements the following:  "Completion of a minimum of eighth grade, preferably high school graduation, and a minimum of one year's experience with the ability to demonstrate skill in the operation of one or more pieces of Equipment Operator III level equipment; or a combination of education and experience equivalent to these requirements."  (Doc. 48, at 138.)  Hollingshead's application identified her as a high school graduate (Defendants' Exh. 11); therefore, some lesser level of experience should have been needed for her to meet the "equivalency" sliding-scale standard.

knew as much as anybody else did, and that's why I made the statement."  (*Id.*)[8]

### B.      The Alleged Deception.

After submitting her applications for Equipment Operator II and III, plaintiff was asked to give a demonstration of her ability to operate this equipment.[9]  The week before that scheduled demonstration, Hollingshead contacted James Turner, Jr., who is head of the Trash Division for the City of Mobile Public Works Department.  (Hollingshead Dep., at 34; Turner Aff., ¶ 2.)  In Hollingshead's words, she told Turner that she "was supposed to have a demonstration," "showed him the letter that [she] was reinstated," and asked if she "could train on the truck because it had been a year, almost, since [she] had actually been in the trucks, and he said yes."  (Hollingshead Dep., at 34.)  Plaintiff admits that she was not, in fact, a City of Mobile employee at that time and that, as a non-employee operating City equipment, she

---

[8]      Plaintiff's confidence on this point is disputed by the City.  Indeed, Ernie Livingston, the head of the Sanitation and Trash Departments who oversaw training on the automatic solid waste trucks, contends that "the training Ms. Hollingshead underwent on the weekends was not equal to the amount of training needed to qualify for an Equipment Operator III position.  Ms. Hollingshead did not have one year of training on the automated solid waste truck."  (Livingston Aff., ¶ 2.)  On that basis, Livingston concludes that "Ms. Hollingshead had not completed the requisite training on the equipment she would need to be able to properly and competently operate as an EO III."  (*Id.*, ¶ 3.)

[9]      The particulars of this demonstration are not fleshed out in the record in great detail.  Drawing reasonable inferences in plaintiff's favor from record facts, however, it appears that the demonstration involved Hollingshead driving City vehicles, as a non-employee, at the Personnel Board's request for purposes of establishing her qualifications for re-employment by the City in the subject classifications.  (Doc. 48, at 4-5.)  Plaintiff's evidence is that she appeared for a performance test at the Mobile Public Works site on November 15, 2006 at the Personnel Board's request for the Equipment Operator II position, for which she received a final rating of 91.00, rendering her #2 on the employment register for that job.  (*Id.* at 129.)  Plaintiff's evidence also reflects that she appeared for a performance test at the Mobile Public Works site on November 21, 2006 at the Personnel Board's request for the Equipment Operator III position, and that she received a final rating of 79.00, good enough for #3 on the certification of eligibles list for that job.  (*Id.* at 130.)  On both of these occasions, it appears that Hollingshead operated City equipment at the Personnel Board's behest, despite her status as a non-employee of the City, without misleading anyone concerning her employment status.  In other words, the record supports a reasonable inference that the City knowingly allowed (and indeed required) Hollingshead to operate its equipment on multiple occasions in fall 2005, despite actual knowledge that she was not a City employee.

"probably would not have been covered" by the City's liability insurance had anything gone awry. (*Id.* at 36-37.)  Both Turner and Hollingshead agree that she told him at that time that she had been "reinstated," even though she had not been rehired as an Equipment Operator II or any other classification of City employee.  (*Id.* at 37; Turner Aff., ¶ 2.)  Turner avers that he perceived Hollingshead's actions in this regard as a misrepresentation, a deceptive act designed to enable her to practice operating City equipment under false pretenses.  (Turner Aff., ¶ 3.)  Public Works Department Superintendent John Windley asserts that Hollingshead "put the City at substantial risk by operating the City's equipment while she was not employed with the City." (Windley Aff., ¶ 3.)

For her part, Hollingshead acknowledges that "[m]aybe [she] didn't word it right" in telling Turner that she had been "reinstated."  (Hollingshead Dep., at 45.)[10]  But her point was that she had been "reinstated" to the re-employment list, not that she had been reinstated in the sense of being rehired as a City employee.[11]  Moreover, to demonstrate that Turner could not reasonably have been deceived, Hollingshead maintains that she also showed him at the time of her request official paperwork reflecting that on September 27, 2006 the Personnel Board had approved her request to be placed on the re-employment list.  (Doc. 48, at 4; Hollingshead Dep., at 34; Defendants' Exh. 9.)  Significantly, this document does not state that Hollingshead had

---

[10]     Plaintiff's testimony on this point is as follows: "Maybe I didn't word it right, but I gave the letter to him which left no question about what I meant.  I said here's the letter; Mr. Dees, Donald Dees has reinstated me. ... I gave him the letter.  I didn't hide nothing." (Hollingshead Dep., at 45.)  This "letter" was the paperwork showing that the Personnel Board had approved Hollingshead's request to be placed on the re-employment list.  Defendants do not contend that plaintiff altered this letter, or that it did not accurately document her employment status.

[11]     The mistake in terminology is perhaps understandable, given that the affidavit submitted by Turner on summary judgment itself utilizes incorrect terminology.  Turner avers that Hollingshead "had only been placed on the ***reinstatement list***."  (Turner Aff., ¶ 2 (emphasis added).)  If Turner understood the re-employment list to be called the "reinstatement list," as he calls it in his affidavit, then it is unclear how Hollingshead's statement that she had been "reinstated" (meaning: placed on what he calls the "reinstatement list") could possibly have been deceptive or misleading to him, particularly when the paperwork she showed him accurately delineated her status.  This raises significant questions as to Turner's explanation that he refused to recommend Hollingshead for hire because she had deceived him.

-6-

actually been reinstated as an employee, but instead merely confirms that her name had been placed on the re-employment list for future hiring consideration.  (*Id.*)  According to Hollingshead, she also told Turner at the time that she requested permission to practice with the trash truck that the purpose of her request was that she wanted to prepare for the exam/demonstration to be rehired.  (Doc. 48, at 4.)[12]  As Hollingshead puts it, the context establishes that Turner must have known that "[she] was not a city employee [and] that was the reason for [her] practicing, [she] was preparing for the up coming [*sic*] examination for employment."  (*Id.* at 39.)

> ### C.      The Equipment Operator Vacancies.

As the Court understands the Complaint, plaintiff is not contending that there was a specific job opening on a specific date for which she should have been hired.  Instead, she is contending that her systematic rejection for all of the numerous Equipment Operator II and III vacancies that were made available by the City of Mobile Public Works Department between fall 2006 and the spring of 2008 was the product of race-, age- and gender-based animus.

It is undisputed that, in filling an Equipment Operator vacancy, the Public Works Department notifies the Mobile County Personnel Board of the job opening, after which the Personnel Board prepares a certified list of eligible candidates for the Department's use in filling the vacancy.  (Hollingshead Dep., at 72.)[13]  Personnel Board rules provide that vacancies "shall

---

[12]      The Court recognizes, of course, that many of plaintiff's factual representations in her summary judgment submission are not set forth in affidavit form.  Notwithstanding this technical infirmity, the Court will consider plaintiff's factual assertions for Rule 56 purposes in light of her *pro se* status and the well-established rule that evidence should be considered on summary judgment if it appears that it can be reduced to admissible form at trial.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n. 2 (S.D. Ala. 2003) ("Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.").  By all appearances, plaintiff's statements in her summary judgment submissions presage the sworn testimony she intends to give on her own behalf at trial; therefore, her direct, unfiltered factual representations in that regard are properly credited at this time.

[13]      This practice is delineated in the Laws and Rules of the Personnel Board, which provide that when a request for certification is received, the Personnel Board furnishes the

be filled in the following order: (1) by transfer within the Classified Service; (2) by re-employment following layoff; (3) by promotion or demotion; (4) by re-employment following resignation; and (5) by certification from the employment register." (Defendants' Exh. 18, § 10.1; doc. 48, at 33-34.) Hollingshead belonged in the fourth category, inasmuch as she was seeking re-employment by the Public Works Department (and had been placed on the re-employment list by the Personnel Board) after having previously resigned in good standing from an Equipment Operator II position in that very Department less than one year earlier.[14]

It is undisputed that the Public Works Department hired well over a dozen Equipment Operator II and III employees between late 2006 and early 2008. Hollingshead was never selected. This is so even though the summary judgment record reflects that the Personnel Board deemed Hollingshead qualified for the Equipment Operator II and III positions, as the "Certification Notes" section of a supplemental data sheet for Hollingshead's employment application contains the following handwritten notation: "Ms. Hollingshead discussed her training through the City of Mobile with me prior to filing for EO II (III). She does meet the MQRs." (Defendants' Exh. 12.) "MQRs" appears to be an acronym standing for "Minimum Qualification Requirements."

With respect to each of these hiring decisions, Public Works Department Superintendent John W. Windley maintains that he "relied on the recommendations of the supervisors and the heads in each division who conducted interviews with the candidates for the Equipment Operator II and Equipment Operator II positions available in the Public Works Department." (Windley

_____

appointing authority with a certification including "the required number of names from the appropriate re-employment or promotion list, or, if there is no such list, certification shall be made from the appropriate employment register." (Defendants' Exh. 18, § 10.7.)

[14]     The Employee Manual promulgated by the Personnel Board explained that if an employee who had resigned in good standing requests to have her name placed on the re-employment list within one year thereafter, "[u]nless there was good reason for not doing so, your request would be approved. You would be certified at the earliest opportunity and the applicants on the re-employment list would rank ahead of the persons on the employment register." (Doc. 48, at 148-49.) This is exactly what happened to Hollingshead, yet the City repeatedly passed over her to hire people whom she ostensibly "ranked ahead of."

Aff., ¶ 4.)[15]  Windley does not indicate that he performed any independent investigation as to supervisors' hiring recommendations for these positions.  He also does not state whether he exercised any authority or had any input into those recommendations with respect to Hollingshead.  Given the Public Works Department's categorical, across-the-board rejection of Hollingshead, across multiple recommending supervisors, a reasonable inference exists that her non-hire was the product of a coordinated non-selection decision, whether orchestrated by Windley or someone else, rather than a mere coincidence resulting from four entirely independent recommenders.  Examination of specific hiring decisions lends further credence to that inference.

For example, on November 27, 2006, the Personnel Board published a Certification of Eligibles reflecting that there were 5 positions to be filled in the Equipment Operator III category.  (Defendants' Exh. 19.)  The Certification listed only three names of certified, eligible candidates.  The first two, Derrick Allen and John Dewayne Hall, were hired into that position. The third name on the Certification was Hollingshead's.  Even though there were three other vacancies for that Equipment Operator III job, Hollingshead was not hired.  (*Id.*)

On December 5, 2006, the Personnel Board published a Certification of Eligibles identifying that there was a single position to be filled in the Equipment Operator II category. (Defendants' Exh. 20.)  This Certification listed no applicants from the promotion list, Hollingshead as the lone candidate from the re-employment list, and three applicants (including Tony Young) from the employment register.  Per Personnel Board rules and documentation, the position should be filled from the re-employment list before consideration is given to candidates from the employment register, such that Hollingshead ranked ahead of the other listed candidates.  Nonetheless, Young was hired, and Hollingshead was passed over.  (*Id.*)

---

[15]     Mobile Mayor Samuel Jones echoes this sentiment by averring that in approving each of the hiring decisions that is in dispute in this action, he did so "based on the recommendations of the Superintendent of Public Works, as well as the supervisors and heads in each division of the Public Works Department."  (Jones Aff., ¶ 2.)  John Bell, Executive Director of the Public Services Division for the City of Mobile, makes the same averment.  (Bell Aff., ¶ 2.)  Therefore, defendants' summary judgment case rests on the strength, completeness and credibility of the supervisor-level recommendations on which Windley, Bell and Jones profess to have relied in making and approving the requisite hiring decisions.

Over the next 12 months, this scenario repeated itself on multiple occasions.  Candidates from the employment register were selected over Hollingshead, despite Personnel Board rules requiring that priority consideration be given to candidates on the re-employment list before persons on the employment register are considered.  Multiple vacancies would be advertised at a time, yet the City consistently opted to leave some of those posted Equipment Operator II and III slots vacant rather than hiring Hollingshead to fill them.[16]  Several examples will illustrate the point.  On January 11, 2007, a Certification of Eligibles was published for a single Equipment Operator II vacancy.  Leriol Lechell Chaney was selected from the employment register to fill that vacancy.  Plaintiff was not, even though her name was on the re-employment list (ranking above the employment register).  (Defendants' Exh. 22.)  On February 28, 2007, a Certification of Eligibles was published for a whopping nine Equipment Operator II vacancies.  Two applicants (Renee Collier and Rudolph Pleasant) were hired from the employment register to fill those jobs; meanwhile, Hollingshead was passed over from the re-employment list yet again.  The other seven vacancies were left unfilled.  (Defendants' Exh. 23.)  On April 19, 2007, a new Certification of Eligibles was published for those seven Equipment Operator II vacancies as the Public Works Department requested a new set of candidates rather than hiring Hollingshead from the old list.  One applicant (Earnest Anthony Jackson) was selected from the employment register, but Hollingshead was passed over altogether from the re-employment list, even though there were still six vacancies remaining.  (Defendants' Exh. 24.)  Those remaining vacancies were listed on Certifications of Eligibles in July 2007 and September 2007, and on each occasion persons from the employment register were hired and Hollingshead was denied selection from

---

[16]     Plaintiff's evidence is that in many instances, there were "leftover" Equipment Operator II and III positions that were not filled.  (Doc. 48, at 34.)  According to Hollingshead, even after the successful candidates were hired, "there were still jobs available and unfilled. [T]hese jobs were opened continually [and] the Public Works Department gave a job fair to draw Equipment Operators because they were needed so badly."  (Id. at 41.)  Hollingshead asserts that these Equipment Operator positions are "continuous open jobs," which she explains means that there are "plenty of open jobs for Equipment Operator II and Equipment Operator III Positions." (Id. at 83.)  The summary judgment record bears out this characterization of the facts.  Despite the abundant availability of these jobs for which Hollingshead was certified and eligible, and the chronic dearth of sufficient other certified, eligible candidates to fill the positions, the City passed her over, time and time again.

the preferential re-employment list even though additional vacancies remained.  (Defendants'
Exhs. 25 & 26.)  The process repeated itself anew in November 2007, when nine Equipment
Operator II jobs were listed on the Certification of Eligibles, three persons from the employment
register were hired (Keith Eugene Griffith, Christopher Holmes, Bernard Pears), the other six
positions went unfilled, and Hollingshead was not selected.  (Defendants' Exh. 28.)  One might
reasonably infer from these circumstances, as Hollingshead did, that defendants harbored no
intention of <u>ever</u> rehiring her.  The question is why.

### D.      Defendants' Explanations for Refusing to Hire Plaintiff.

To explain this systematic exclusion of Hollingshead, defendants proffer the affidavits of
the four recommending supervisors involved in filling the contested Equipment Operator II and
III vacancies.  Each will be summarized in turn.

Alvin Porter, who was the head of the Street Division, made recommendations for four of
the Equipment Operator II positions.  In explaining why he selected the candidates he did, Porter
touts the qualifications of each successful applicant; however, he does not compare their
qualifications to those of Hollingshead, does not assert that he deemed those successful
candidates to be more qualified than Hollingshead, does not explain why he leapfrogged
Hollingshead from the re-employment list to pick candidates from the employment register (in
apparent derogation of Personnel Board rules), and does not explain why he refused to
recommend plaintiff even when vacancies remained after he chose the other candidates.  (Porter
Aff.)[17]

Ernie Livingston, the head of the Sanitation and Trash Departments, made the
recommendations to hire Allen and Hall for Equipment Operator III vacancies in November
2006.  He states that he selected Allen and Hall over Hollingshead because "the Personnel Board
rules required that they be appointed from the promotion list before Ms. Hollingshead could be
appointed from the re-employment list."  (Livingston Aff., ¶ 3.)  He also states that Hollingshead
was not selected because she "had not completed the requisite training on the equipment she

---

[17]      For example, in September 2007, Porter recommended Tarris Bassett for an
Equipment Operator II position in the Street Division.  But there were 3 vacancies listed at that
time.  (Defendants' Exh. 26.)  Porter failed to recommend Hollingshead for either of the two
remaining vacancies.  His affidavit is silent as to why.

-11-

would need to be able to properly and competently operate as an EO III." (*Id.*)

James Turner, the head of the Trash Division, made the vast majority of the Equipment Operator II recommendations. Although his affidavit is brimming with descriptions of the absolute qualifications of the persons he selected to fill those vacancies, he never compares the qualifications of the successful applicants to those of Hollingshead. He never suggests that Hollingshead was less qualified than those successful candidates, or that she was unqualified to work as an Equipment Operator II. Instead, Turner explains that he elected not to recommend Hollingshead for any of these positions "because of the incident where she had misrepresented to me that she had been reinstated" and because of her "past history with other departments of a negative working relationship with other employees and a negative attitude, as well as her lack of experience operating combination equipment, such as truck and trailer." (Turner Aff., ¶ 3.)[18]

Finally, Phillip Collins, who oversees the Dredge Department, recommended the hiring of Tony Young from the employment register to fill an Equipment Operator II position in December 2006. (Defendant's Exh. 20; Collins Aff., ¶¶ 1, 3.) Hollingshead was listed on the Personnel Board's Certification List for that position, with her name on the re-employment list such that she should receive priority consideration over Young and others from the employment register; however, Collins passed over her to select Young. In his affidavit, Collins does not explain why he did not select Hollingshead, despite her re-employment list status; however, he does aver that Young had already been driving a dump truck at the landfill for two to three years, and states in conclusory terms that Young "was the best candidate for the position." (Collins Aff., ¶ 3.)

### E. *Administrative Charge of Discrimination.*

On January 23, 2007, Hollingshead filed a Charge of Discrimination with the Equal

---

[18]     For her part, Hollingshead disputes that she had a past history of a negative working relationship with others or a negative attitude, and contends that this allegation is a fabrication. (Doc. 48, at 5.) Defendants have come forward with no evidence to support Turner's conclusory assertion in this regard. And as for her lack of experience operating combination equipment, Turner does not affirmatively state that all of the successful candidates actually did possess such experience (Turner Aff., ¶¶ 4-14); therefore, a reasonable inference may be drawn that he excluded Hollingshead for lacking a qualification that he did not require of other candidates whom he selected for hire.

Employment Opportunity Commission against the City of Mobile Public Works Department. The Charge alleged that the City had discriminated against plaintiff on the basis of race, sex and age by failing and refusing to hire her for the positions of Equipment Operator II and Equipment Operator III, even though she had passed examinations for both jobs. (Defendants' Exh. 30.) The Charge identified the earliest date of the alleged discrimination as being November 27, 2006. (*Id.*) The EEOC issued a Right to Sue Letter (doc. 48, at 109) to Hollingshead on June 18, 2007, instructing her that any lawsuit she wished to pursue based on this Charge must be filed within 90 days of her receipt of that notice. Hollingshead filed her Complaint in this District Court on August 27, 2007, and filed an Amended Complaint on January 18, 2008.

**III.    Summary Judgment Standard.**

Summary judgment should be granted only if the record establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the

-13-

summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

## IV.    Analysis.[19]

### A.    *Identity of Defendants.*

As an initial matter, the Court observes that the three named defendants are all individual City officials, to-wit: John Windley, John Bell, and Samuel Jones.  On their face, plaintiff's causes of action joined herein sound exclusively in Title VII and the ADEA.  The law of this Circuit is clear that "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act, regardless of whether the employer is a public company or a private company."  *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) (recognizing that Title VII relief must be granted against the employer, not individual employees whose acts are violative of the Act).  In this case, the appropriate "employer" for Title VII / ADEA purposes would appear to be the City of Mobile (which is not named as a defendant) and not the three City officials who are named as defendants.  Notwithstanding this flaw in Hollingshead's pleadings, defendants have construed her claims as being leveled against the City, regardless of how they are nominally framed.  Indeed, defendants assert in their summary judgment brief that "Hollingshead has asserted a claim **against the City of Mobile** for a

---

[19]      In examining the parties' respective summary judgment arguments, the Court proceeds in recognition of the less stringent standards applied to *pro se* filings.  *See, e.g., Erickson v. Pardus*, --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) ("a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"); *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (noting that "we are to give liberal construction to the pleadings of *pro se* litigants").  That said, the Court also recognizes that a filer's *pro se* status does not excuse her from compliance with the Federal Rules of Civil Procedure.  *See Albra*, 490 F.3d at 829 (notwithstanding liberal construction of *pro se* filers' pleadings, "we nevertheless have required them to conform to procedural rules") (citation omitted); *Hales v. City of Montgomery*, 347 F. Supp.2d 1167, 1171 (M.D. Ala. 2004) ("Notwithstanding a more liberal construction, however, the *pro se* plaintiff's complaint must meet the minimum requirements of presenting a viable claim.").  Furthermore, the leniency afforded *pro se* litigants unquestionably does not give this Court license to serve as *de facto* counsel for Hollingshead or to rewrite otherwise deficient pleadings on her behalf.  *See GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998).

-14-

violation of Title VII of the Civil Rights Act of 1964." (Doc. 44, at 13 (emphasis added).) Defendants have not argued on summary judgment that Hollingshead's claims should be dismissed because she named the wrong defendant. Instead, defendants have expressly construed plaintiff's Title VII/ADEA claims as being brought against the City itself, and have proceeded accordingly in defending against those claims. By all appearances, defendants' summary judgment filings are filed by and on behalf of the City of Mobile, the proper (albeit unnamed) defendant; therefore, the Court will likewise construe plaintiff's claims as having been brought against the City pursuant to Rule 15(b)(2), Fed.R.Civ.P., which allows unpleaded issues to be tried by the parties' express or implied consent. *See generally Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003) ("issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties ... or are included in a pretrial order") (internal quotations and citations omitted).[20]

### B.    *Statute of Limitations.*

In various of her filings, Hollingshead has suggested that she seeks relief not only for the City's failure to rehire her as an Equipment Operator II or III in late 2006 and 2007, but also for certain adverse actions taken against her in 2005 prior to her resignation from the City. In particular, Hollingshead accuses Windley of discriminating against her by passing over her for the position of Public Service Supervisor I as to the landfill in 2005 and also accuses Windley of preventing her from transferring to the Garbage Department at that time. (Doc. 20, at 2; doc. 49, at 3-4.) Defendants contend that they are entitled to judgment as a matter of law on these issues because any claims of alleged discrimination in 2005 are untimely and unexhausted. The Court agrees.

It is black-letter law that a plaintiff may not sue under Title VII or the ADEA unless she first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (Title

---

[20]    Having maintained through the summary judgment phase that Hollingshead's claims have been brought against the City, defendants may not now backtrack on this position. The Court will discuss with the parties at the pretrial conference how best to effectuate the mechanics of amending the parties in this action to reflect the alignment under which these parties have chosen to litigate.

VII); *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11th Cir. 2003) (ADEA).  In a non-deferral

state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act.

*See Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005)

(explaining that Alabama is a non-deferral state, such that only unlawful practices occurring

within 180 days of the operative EEOC charge can yield Title VII liability); *Jones*, 331 F.3d at

1263 (finding that in states such as Alabama with no state equivalent to EEOC, ADEA requires

charge to be filed within 180 days).  "If the victim of an employer's unlawful employment

practice does not file a timely complaint, the unlawful practice ceases to have legal significance,

and the employer is entitled to treat the unlawful practice as if it were lawful."  *City of Hialeah,

Fla. v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002); *see also Jordan v. City of Montgomery*, 2008

WL 2529573, *1 (11th Cir. June 26, 2008) ("Failure to file a timely charge with the EEOC results

in a bar of the claims contained in the untimely charge.").

It is clear that Hollingshead never filed an EEOC charge relating to the alleged

discriminatory denial of promotions or transfers in 2005.  As such, any attempt by plaintiff to

litigate those claims in this action is impermissible because they are time-barred as a matter of

law.  Defendants' Rule 56 Motion is **granted** insofar as it seeks dismissal of plaintiff's

discrimination claims pertaining to her 2005 non-promotion to the position of Public Service

Supervisor I and her 2005 non-transfer to the Garbage Department.  Those claims are **dismissed

with prejudice**.[21]

    *C.*    **McDonnell Douglas** *Framework.*

Defendants' Rule 56 Motion with respect to Hollingshead's discrimination claims is

properly analyzed in accordance with the time-honored *McDonnell Douglas* framework.  Absent

---

    [21]    That said, the Court does not categorically foreclose plaintiff from introducing
evidence of these 2005 incidents in support of her claim that defendants discriminated against
her in 2006 and 2007.  Such evidence may be admissible background evidence.  *See United Air
Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885 (1977) (discriminatory act not made the
basis of a timely charge "may constitute relevant background evidence in a proceeding in which
the status of a current practice is at issue"); *Allen v. Montgomery County, Ala.*, 788 F.2d 1485,
1488 (11th Cir. 1986) (pointing out that evidence of time-barred conduct in discrimination case
may be relevant and admissible to illuminate current practices which, viewed in isolation, may
not indicate discriminatory motives).  That evidentiary issue is properly addressed via motion in
limine filed at an appropriate time.

direct evidence of discrimination (which has neither been alleged nor shown here), Hollingshead must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race, sex or age discrimination.[22]  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11ᵗʰ Cir. 2005).  At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11ᵗʰ Cir. 1997) (citations omitted).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11ᵗʰ Cir. 2006) (quotation omitted).  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11ᵗʰ Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11ᵗʰ Cir. 2000) (*en banc*).

>    **D.    *Plaintiff's* Prima Facie *Case.***

"In a traditional failure-to-hire case, the plaintiff establishes a *prima facie* case by demonstrating that: (1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class."  *Joe's Stone Crabs*, 296 F.3d at 1273; *see also Rioux*, 520 F.3d at 1275 n.6

---

[22]    Hollingshead's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11ᵗʰ Cir. 2001) ("the *prima facie* requirement is not an onerous one").

("a complainant in a Title VII case may meet his burden of establishing a *prima facie* case of racial discrimination by showing (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued seeking applicants from persons of complainant's qualifications").

In their summary judgment briefs, defendants do not contest Hollingshead's ability to satisfy the first, second and third elements of her *prima facie* case.  Instead, defendants assert that plaintiff cannot satisfy the fourth element because certain of the vacancies in question were filled by African-Americans, women, or persons over the age of 40.  But this argument overlooks the "remained open" prong of that element.  Viewed most favorably to plaintiff, the evidence is not that the City refused to hire Hollingshead for discrete vacancies.  Rather, the record shows that the City had, for all practical purposes, unlimited vacancies in both the Equipment Operator II and III positions, with more openings in those classifications than certified, eligible candidates to fill them.  Repeatedly, the City left these positions empty rather than hiring Hollingshead, then re-advertised those same jobs later in an attempt to draw in new candidates.  When Hollingshead's name again appeared at the top of the certification list for those same positions, the City would again pass over her, fill some vacancies from the employment register, leave the remainder unfilled, and repeat the process.  Because in so many instances the City rejected Hollingshead, then left some or all of the positions open, the Court finds that she has established the fourth element of her *prima facie* case of race, age and sex discrimination, irrespective of the demographic characteristics of the persons who were hired to fill certain of these vacancies.  *See Joe's Stone Crabs*, 296 F.3d at 1273 (fourth element of *prima facie* case in failure-to-hire context is that "the position remained open or was filled by another person outside of her protected class").[23]

---

[23]     In any event, it bears noting that plaintiff would satisfy the fourth element of her *prima facie* case as to many of these hiring decisions even if the demographics of the successful candidates are taken into account.  Virtually all of the candidates hired by the City for the positions at issue during the relevant time frame were male.  Apparently, all of them were younger than plaintiff, most by a substantial margin.  And several were white.  Thus, plaintiff has met her *prima facie* burden even if one looks past the fact that the City left certain of those vacancies open continuously before and after it rejected Hollingshead.

### E.      Defendants' Legitimate Nondiscriminatory Reason.

Plaintiff having satisfied her *prima facie* burden under Title VII and the ADEA, the burden shifts to defendants to "offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption" of retaliation.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) ("To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus.") (citations omitted).  This burden of production is exceedingly light.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light, and is satisfied as long as employer articulates clear and reasonably specific non-discriminatory basis for its actions).  That said, defendants' burden is not so ethereal as to be nonexistent, and defendants cannot satisfy it with cursory conclusions unbacked by evidentiary support.  *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (to raise genuine issue of fact, defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for" the challenged personnel decision); *IMPACT v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (reversing lower court's finding that defendants satisfied burden of production where they merely contended that person believed to be most qualified was hired); *Steger*, 318 F.3d at 1076 (applying *IMPACT* to deem inadequate defendant's general statement that employment decision was predicated on hiring of best qualified applicant).

The problem defendants confront is that their summary judgment filings offer precious little justification for their systematic rejection of Hollingshead for all Equipment Operator II and III positions in the Public Works Department.  Certain of the recommenders (including most notably Porter and Collins, and to a lesser extent Turner) extol the qualifications of the successful applicants without ever comparing their qualifications to those of Hollingshead. What matters in this case is not whether the persons hired were qualified for the job, but why those persons were selected when Hollingshead was not.  Thus, merely asserting that the chosen applicants for certain vacancies were qualified, with no evidence or indication that these recommenders deemed the successful applicants more qualified than plaintiff (much less a statement outlining a plausible factual basis for that conclusion) does not amount to a legitimate

nondiscriminatory reason for the non-selection of Hollingshead.[24]

The infirmities in defendants' summary judgment filings run much deeper.  As noted *supra*, the summary judgment record reflects that the Public Works Department had standing, continuous vacancies for Equipment Operators II and III.  Rather than hiring Hollingshead for one of those positions, the City time and time again elected to leave them open and unfilled.  It is that decision – the coordinated, purposeful blacklisting of Hollingshead from all Public Works Department jobs – that ultimately animates plaintiff's discrimination claims and that cries out for justification.  For defendants to state, as they do, that every person they did hire was qualified is to obscure the essence of plaintiff's claims.  The critical question is not why the Public Works Department hired the people it did.  The question is why the Public Works Department chose to leave published Equipment Operator II and III vacancies unfilled, sometimes for months at a time, soliciting several new Certification Lists along the way, rather than hiring Hollingshead, a certified, eligible candidate from the re-employment list.  It is the opinion of this Court that defendants' summary judgment submissions fail to articulate a satisfactory answer to that question encompassing all (rather than a mere subset) of the vacancies at issue.

At most, two of the four recommenders involved in these hiring decisions, Ernie Livingston and James Turner, proffer some affirmative explanation for their decision to pass over Hollingshead.[25]  Livingston says that, as to the Equipment Operator III positions for which

---

[24]     To be sure, defendants' counsel asserts in their brief that "the decisions not to select the Plaintiff were based upon the superior qualifications of the other candidates when compared to the Plaintiff."  (Doc. 44, at 23.)  But the recommenders' affidavits largely omit any discussion of the relative qualifications of plaintiff and the other candidates, much less a statement that the recommenders deemed those other candidates to be more qualified than plaintiff.  Unsupported representations of counsel are not credited on summary judgment.  *See Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

[25]     The third recommender, Phillip Collins, says nothing about Hollingshead, but indicates in conclusory terms that the successful applicant "was the best candidate for the position."  (Collins Aff., ¶ 3.)  That kind of general sentiment, untethered from any discussion of the relative qualifications of the plaintiff and the successful candidate, has been deemed insufficient to meet even the light burden of production imposed on employers under *Burdine*.  *See Steger*, 318 F.3d at 1076 ("A defendant may not merely state that the employment decision

he made hiring recommendations, plaintiff was not selected because (a) the two chosen applicants were on the promotion list and therefore received priority; and (b) in Livingston's view, "Hollingshead had not completed the requisite training on the equipment she would need to be able to properly and competently operate as an EO III."  (Livingston Aff., ¶ 3.)  For his part, Turner maintains that he did not select Hollingshead for any of the numerous Equipment Operator II positions for which he made hiring recommendations for the following reasons: (a) "the incident where she had misrepresented to [Turner] that she had been reinstated"; (b) "Ms. Hollingshead's past history with other departments of a negative working relationship with other employees and a negative attitude"; and (c) "her lack of experience operating combination equipment, such as truck and trailer."  (Turner Aff., ¶ 3.)

As to the positions for which Livingston and Turner supplied recommendations, defendants have satisfied their burden of production.  However, with respect to the positions for which Livingston or Turner did not provide recommendations, the summary judgment record is bereft of any justification for the Public Works Department's across-the-board refusal to hire Hollingshead, such that defendants have failed to meet their slender burden of production for *McDonnell Douglas* purposes.  Simply stated, the record is devoid of any explanation for why Collins and Porter chose not to recommend Hollingshead for the positions within their respective spheres of authority, with Collins offering only a generic statement that he chose the most qualified person and Porter not even attempting to explain why he elected to leave two vacancies unfilled and request a new list from the Personnel Board rather than hiring Hollingshead from the existing Certification List.

### F.      Pretext.

To the extent that defendants have satisfied their burden of production, the viability of Hollingshead's Title VII and ADEA causes of action hinges on her ability to demonstrate

---

was based on the hiring of the 'best qualified' applicant ...."). The fourth recommender, Alvin Porter, offers no explanation at all of why he did not select Hollingshead for the two remaining vacancies after he hired Tarris Bassett, but instead went back to the Personnel Board to request a new Certification List with a new batch of applicants even though a certified eligible (Hollingshead) remained unselected and available from the previous list. At most, Porter avers that the employees he selected were qualified, but he does not even state that he deemed them more qualified than Hollingshead, much less offer a factual basis for such a conclusion.

pretext.  To satisfy her burden of showing pretext at the summary judgment stage, Hollingshead must "demonstrate that the proffered reason was not the true reason for the employment decision." *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.") (internal quotations and citations omitted).  She may do that "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson*, 405 F.3d at 1289.  Hollingshead's pretext argument centers on the notion that the City's stated reasons for failing and refusing to hire her are not believable; therefore, in order for her claims to withstand summary judgment, her evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (citations omitted).

As discussed previously, taken in the light most favorable to plaintiff, the summary judgment record supports a reasonable inference that the City and/or Public Works Department categorically barred Hollingshead from rehire as an Equipment Operator II or III.  There were continuously open positions in these job classifications, and Hollingshead's name repeatedly was featured at the top of the Personnel Board Certification of Eligibles as the lone applicant from the re-employment list.  Yet time after time, the City bypassed her, either to select applicants from the lower-ranking employment register or to leave positions unfilled altogether.  These facts give rise to a strong inference of systematic exclusion, as it appears that under no circumstances would the Public Works Department consider hiring her, even for positions for which she was qualified, certified, eligible and entitled to favorable consideration as a re-employment list candidate.

The unexplained mystery is why the City would blacklist Hollingshead in this fashion. After all, she had previously worked for the City as an Equipment Operator II for more than four years.  During that time, plaintiff had diligently availed herself of extra training opportunities,

often coming in on weekends to train on more advanced equipment.  She had received a "high quality job performance" rating in April 2005 before voluntarily resigning in good standing a few months later to pursue a supervisory opportunity in Prichard.  When Hollingshead decided to seek re-employment by the City in fall 2006, the Personnel Board placed her on the "re-employment list," which (by the plain language of Personnel Board rules) entitled her to preferential treatment in hiring over those applicants in the employment register.  She took and successfully completed Personnel Board-administered performance tests for both the Equipment Operator II and III positions in November 2006, scoring a 91 and a 79, respectively, and rating #2 and #3 on the Certification Lists for those jobs.  On her application form, a City or Personnel Board official wrote the following: "Ms. Hollingshead discussed her training through the City of Mobile with me prior to filing for EOII (III).  She does meet the MQRs."  (Defendants' Exh. 12, at 16.)  The Personnel Board repeatedly certified her as an eligible candidate for vacant Equipment Operator II and III jobs.

Put it all together, and the record shows that this 55-year old African-American female with a history of "high quality job performance" for the City applied for jobs for which she was eminently qualified and for which the Public Works Department had ongoing and continuous needs to fill vacancies.  However, the Department refused to hire her, across the board, for any vacancy.  Why?  Suspicion rises when one observes that many candidates who were hired were selected from the "employment register," even though the Personnel Board's rules stated unambiguously that positions should be filled from the re-employment list (where Hollingshead's name was found) before the employment register should be consulted.  Why was that not done here?  These questions resonate even louder when one recognizes that the demographic makeup of the people the City did hire was overwhelmingly male and considerably younger than Hollingshead, and also included some white candidates.

Defendants' evidence is that each position for which Hollingshead applied was subject to the hiring recommendations of one of four decisionmakers, dependent on the particular service area from which the vacancy emanated.[26]  The bulk of those positions were subject to the

---

[26]     The recommenders' reasoning matters because the nominal decisionmakers (Bell, Windley and Jones) have all testified that they relied on those recommendations and have

recommendations of James Turner, with several positions subject to the recommendations of Ernie Livingston. A handful were under Alvin Porter, and a single one was handled by Phillip Collins. As already discussed, Porter and Collins have not offered any meaningful justification of their non-selection of Hollingshead; therefore, questions of material fact obviously remain as to the reasons why she was not hired for the vacancies subject to their recommendations.

As for Turner, his testimony is that he would not recommend plaintiff for hire because she had "misrepresented to [him] that she had been reinstated in order to practice on City equipment." (Turner Aff., ¶ 3.) But the evidence in the light most favorable to plaintiff is that, not only did she not misrepresent anything to Turner, but Turner could not reasonably or in good faith have believed that she made misrepresentations to him. Indeed, plaintiff's evidence includes the following: (a) Hollingshead showed Turner paperwork accurately reflecting her status as approved to the re-employment list, such that he could not have been misled into believing her status to be otherwise; (b) in their conversation, Hollingshead made clear that the entire reason she wished to practice on City equipment was because she was subject to performance tests by the Personnel Board before she could be rehired as an Equipment Operator II; (c) Turner must have known that if Hollingshead had already been rehired as an Equipment Operator II, there would have been no need for the Personnel Board to test her performance driving that equipment after the fact; and (d) although Hollingshead used the term "reinstated," Turner's testimony reflects that he understood the re-employment list to be called the "reinstatement list," such that there could have been no deception at all (*i.e.*, she was "reinstated" to the "reinstatement list," which Turner admits is not synonymous with having been rehired). From these facts, a reasonable fact finder could conclude that Turner could not possibly have believed that Hollingshead was lying to him about her employment status in order to practice on City equipment. Thus, a reasonable fact finder could conclude that defendants' stated reason of refusing to hire Hollingshead because she had lied to Turner was so implausible as to be

_____

identified no independent grounds for their decisions. Therefore, the only explanations that the City has provided for the challenged personnel decisions are those articulated by the four recommenders (Livingston, Turner, Porter and Collins). Given this posture, the pretext analysis on summary judgment turns on the plausibility, consistency, credibility and completeness of those witnesses' proffered rationales for their hiring recommendations.

-24-

unworthy of credence.[27]

Turner also alleges that he would not consider Hollingshead for rehire because of her "past history with other departments of a negative working relationship with other employees and a negative attitude." (Turner Aff., ¶ 3.) Hollingshead emphatically denies such a history, and defendants offer no evidence to demonstrate any reasonable basis for Turner's assessment in this regard. Moreover, the undisputed evidence is that plaintiff was rated "high quality job performance" by the Department of Public Works in April 2005, shortly before she voluntarily resigned in good standing to pursue an attractive career opportunity elsewhere. Surely, a bad-apple employee who had "negative working relationships" and a "negative attitude," as Turner asserts, would not have been rated "high quality" in her final evaluation by the City. Thus, genuine issues of material fact exist as to whether Turner could reasonably have believed that she had a "negative working relationship" and "negative attitude" that might justify her systematic exclusion from re-employment, or whether her non-selection was instead motivated by impermissible considerations.

Finally, Turner asserts that he declined to recommend Hollingshead for the position of Equipment Operator II because of "her lack of experience operating combination equipment, such as truck and trailer." (Turner Aff., ¶ 3.) But Hollingshead's application includes an official notation that she does meet the Minimum Qualification Requirements for the position.

---

[27]     In that same vein, defendants argue that the reason Hollingshead's purported "deception" of Turner was such a big deal was that "[b]ecause she was not employed with the City, there would be liability problems if she had been involved in any type of accident while driving the truck." (Windley Aff., ¶ 3.) Defendants insist that nowhere in the applicable policy "does it allow non-employees to drive City owned vehicles." (Doc. 50, at 3.) But the evidence in the light most favorable to plaintiff undermines defendants' credibility on this point. Indeed, plaintiff's evidence is that, while still not employed by the City, Hollingshead was required by the Personnel Board to come down to the yard on two separate occasions to demonstrate her proficiency in operating City equipment as a performance test. Why was it a grave liability risk for a non-employee to operate City equipment (with City permission and supervision) in the first scenario if the City and Personnel Board knowingly allowed (and, indeed, required) her to operate City equipment as a non-employee in the second scenario? Did a policy that, defendants maintain, never allowed non-employees to drive City vehicles somehow become suspended for plaintiff's performance tests? Defendants do not explain this facial inconsistency in their position, which further cements the likelihood that a reasonable fact finder could reject defendants' explanation as unworthy of credence.

Moreover, Turner's affidavit does not confirm that every single one of the people he recommended for hire in the Equipment Operator II job did possess such combination equipment experience, so it appears that this criterion was not applied evenly to all candidates.  Finally, this explanation overlooks the fact that Hollingshead passed her performance test for Equipment Operator II in November 2006 with flying colors.  Considered in the aggregate, these inconsistencies, incoherencies and implausibilities demonstrate, at a minimum, that there are genuine issues of material fact as to whether defendants' explanation that Hollingshead was passed over because of her lack of combination equipment experience is a pretext for discrimination.

The fourth and final decisionmaker, Ernie Livingston, says he selected two applicants (Allen and Hall) over Hollingshead for Equipment Operator III vacancies because they were on the promotion list, entitling them to priority consideration under Personnel Board rules. (Livingston Aff., ¶ 3.)[28]  Be that as it may, the requisite Personnel Board Certification List reflects that there were five vacancies, not two, and that Hollingshead's name was the only other name on the list.  (Defendants' Exh. 19.)  Thus, Livingston's explanation that he did not select Hollingshead because Allen and Hall warranted priority consideration under applicable rules is, at best, incomplete.  Livingston supplements this justification by asserting that he "knew Ms. Hollingshead had not completed the requisite training on the equipment she would need to be able to properly and competently operate as an EO III."  (Livingston Aff., ¶ 3.)  But Hollingshead's evidence is that (a) she had trained extensively on that equipment, (b) she "knew as much as anybody else did" about the operation of that equipment, (c) the Personnel Board and/or Public Works Department had noted on her application that she satisfied the Minimum Qualification Requirements for the Equipment Operator III position, and (d) she had submitted to and successfully completed a Personnel Board-sponsored performance test in the operation of City equipment within the EO III classification.  Considering all of this evidence that plaintiff

---

[28]    Interestingly, defendants rely on the Personnel Board rules regarding the order of filling vacancies on those occasions when such rules suit their purposes, but appear to ignore them on other occasions when those rules appear to run contrary to the actual decisionmaking process undertaken.  Such selective and sporadic reliance on these rules is, itself, evidence of pretext.

was indeed qualified and properly trained to serve as an Equipment Operator III, a reasonable factfinder could conclude that Livingston's assertion that he passed over Hollingshead because she was incapable of competently operating EO III equipment is riddled by inconsistencies and implausibilities that render it not credible, thereby raising an inference that the her non-selection was motivated by unlawful discrimination.

To be clear, the Court fully understands that its role "is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments." *Wilson*, 376 F.3d at 1092 (citation omitted); *see also Chapman*, 229 F.3d at 1030 ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.").  In finding genuine issues of fact, the Court is not making a judgment call as to whether the Public Works Department's hiring decisions were wise or foolish, prudent or rash. The point is that, taking the summary judgment record in the light most favorable to Hollingshead, defendants' stated reasons for their coordinated decision to categorically bar her from rehire into any of the myriad available Equipment Operator II or III vacancies appear unreasonable, inconsistent and incomplete to the point of lacking credibility, such that a reasonable factfinder could conclude that these stated reasons are not the true reasons for defendants' actions and that the real reason was unlawful discrimination.  These genuine issues of material fact on the issue of pretext compel a conclusion that defendants are not entitled to summary judgment, and that it is for the finder of fact at trial to determine whether the City's hiring decisions with respect to Hollingshead were the product of race/age/sex discrimination.

## V.   Conclusion.

For all of the foregoing reasons, defendants' Motion for Summary Judgment (doc. 43) is **granted in part**, and **denied in part**.  The Motion is **granted** insofar as plaintiff claims that defendants violated Title VII or the ADEA by failing to promote or transfer her in 2005.  Any such claims are untimely and are also barred for failure to exhaust administrative remedies.  In all other respects, defendants' Motion is **denied**.  To the extent that plaintiff's filing at document 48 purports to seek entry of summary judgment in plaintiff's favor, that Motion is **denied** given the presence of numerous obvious genuine issues of material fact, as discussed herein.  Finally, plaintiff's motion to strike which is incorporated at document 48 is **denied** because the mere fact

that she disputes the veracity of certain affidavits submitted by defendants is not a legally sound basis for striking them from the court file.

A separate Order will be entered to implement appropriate arrangements for final pretrial and trial scheduling of this action.

DONE and ORDERED this 31st day of October, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE